**FILED**

JUN - 8 2006

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

MARY B. WILSON,

      Plaintiff,

v.                                Civil Action No. 2:05CV44
                                      (The Honorable Robert E. Maxwell)

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying the Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Mary B. Wilson ("Plaintiff") filed an application for DIB on June 26, 2002, alleging disability since March 5, 2002, due to bulged and herniated "vertibre [sic] # 2, 3, 4 & 5" and panic disorder (R. 86-89, 93). Plaintiff's applications were denied at the initial and reconsideration levels (R. 48, 59, 61-62). Plaintiff requested a hearing, which Administrative Law Judge Guy B. Arthur ("ALJ") held on August 1, 2003 (R. 246-72). Plaintiff, represented by counsel, Anthony Rogers, testified on her own behalf (R. 248-64). A vocational expert also testified ("VE") (R. 264-72). On December 4, 2003, the ALJ entered a decision finding Plaintiff was not disabled (R.27-35). On

February 18, 2005, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-8).

## II. STATEMENT OF FACTS

Plaintiff was born August 16, 1959, and was forty-four years old at the time of the ALJ's decision (R. 86). Plaintiff completed high school and two years of college (R. 99). Plaintiff was awarded an Associate of Arts degree in data processing from Allegheny Community College (R. 157). Plaintiff's past relevant work included that of telephone operator, pharmacy office staff, dairy office clerk, and buyer for an aerospace company (R. 94).

On January 28, 1999, Renato Espina, M.D., compiled Clinical Data relative to Plaintiff. Dr. Espina noted Plaintiff drank beer occasionally, had undergone four carpal tunnel releases on the right wrist and one on the left, had normal HEENT, neck, lungs, heart, abdomen, and extremities (R. 213).

On May 4, 2001, Plaintiff presented to Patrick D. Ireland, M.D., of Winchester Neurological Consultants, for her second epidural steroid injection. Her first injection was three weeks prior to this date and provided to Plaintiff at the "Pain Clinic." Plaintiff reported she had "seen a lot of improvement from the injection" in that she was in "no pain whatsoever" and experienced "a little stiffness in her neck." Plaintiff asserted she worked with a mouse pad on a computer, which caused some pain in her forearm and around her wrist, but that "the strong radicular pain from her neck down into her arm [was] gone." Dr. Ireland instructed Plaintiff to gradually increase her activities and prescribed Lodine. Based on Dr. Ireland's examination of Plaintiff, the second epidural steroid injection was not administered (R. 150).

On June 14, 2001, Plaintiff returned to Dr. Ireland and reported she was "doing very well."

She reported little numbness and that she experienced a "funny feeling down her forearm," but no pain. Plaintiff reported she had "been doing more than she would like to and . . . [had not] taken any medication for 4 days." Dr. Ireland opined Plaintiff had recovered "well from her radiculopathy" and he did not "think there [was] anything surgical to do." He released Plaintiff from his care (R. 149).

On July 31, 2001, Plaintiff presented to Dr. Espina for nervousness and possible panic attack disorder. Plaintiff reported that "[o]ne time she was driving home, she became very tense and nervous. Her heart was pounding and she had trouble breathing. She was shaking all over. She[had] been under a lot of stress lately. She had a few minor accidents with her motorcycle and her car." Plaintiff reported her cervical disk discomfort was treated with injections and by a chiropractor, but she realized no improvements of her symptoms. Plaintiff reported she awoke at 2:00 or 3:00 a.m. and could not return to sleep. She experienced "palpitations but no chest pains." Dr. Espina assessed panic attack disorder and possible depression. Dr. Espina prescribed Alprazolam and Paxil. Plaintiff was instructed to return in six weeks (R. 212).

On September 10, 2001, Plaintiff returned to Dr. Espina and reported her "nerves" were better. She reported she had experienced bad dreams and feeling hyper as a result of Paxil. Dr. Espina advised Plaintiff to ingest 10mg of Paxil in the morning, not 20mg. Dr. Espina noted she smelled alcohol on Plaintiff's breath during that morning's examination, and Plaintiff stated she had drunk some "beers last evening while staying at her cabin." Dr. Espina cautioned Plaintiff about drinking while taking Paxil. Dr. Espina continued Plaintiff's prescriptions for Alprazolam and Paxil (R. 211).

On October 16, 2001, Plaintiff reported to Dr. Espina that Paxil caused nausea. Dr. Espina prescribed Alprazolam to Plaintiff on October 19, 2001 (R. 210).

3

On March 28, 2002, Plaintiff returned to Dr. Ireland with complaints of "more pain in . . . neck over the last 2 months or so and it [had] been progressive." Plaintiff stated she experienced pain "in her neck, down her right arm, down to the dorsum of her hand with paresthesias" and "numbness, tingling and the abnormal sensations . . . along the dorsum of her hand, forearm and even up into his distal arm." Plaintiff's symptoms were on her right side. Plaintiff requested a refill of her prescription for Lodine, which took "the edge off [the pain] a little bit" but had not "made a huge difference." Dr. Ireland recommended a "C5-6 epidural steroid injection" for, prescribed Lodine 1200mg daily to, and provided Ultracet samples and prescription to Plaintiff (R. 148).

On April 9, 2002, George L. Sheppard, Jr. M.D., administered a C5-6 cervical epidural steroid injection to Plaintiff, which she "tolerated . . . well" (R. 147).

Plaintiff's June 12, 2002, MRI was canceled (R. 152).

In her June 25, 2002, application for DIB benefits, Plaintiff noted she experienced pain in her arms, shoulders and neck, which caused numbness in her legs and feet. She asserted she could not operate a vehicle and could not sit for long periods of time (R. 93). Plaintiff noted she experienced "anxiety attacks at work; emotional outburst such as crying and shaking." Plaintiff asserted she "attempted to return to work after March 5, 2002, but one day sitting caused severe pain the following day making it impossible to return to work. The severe pain continued for several weeks." Plaintiff wrote this episode caused her to need assistance "at home to carry, lift and sometimes dress" herself and to experience difficulty tolerating "walking, sitting, reaching." Plaintiff further asserted "the process of filing out [the] application, which took approx 1 hr. or more caused the pain [she'd] been experiencing to start again, the same as that causing me not to drive or work" (R. 100).

4

On July 24, 2002, Plaintiff completed an Activities of Daily Living report (R. 114-18). Plaintiff reported she experienced difficulty sleeping at night due to "discomfort (i.e. pain & numbness) in neck, arms, lower legs & feet." Plaintiff noted she retired between 10:00 and 11:00 p.m. and rose between 7:00 and 8:00 a.m. and that she "occasionally" napped during the day. Plaintiff asserted she needed no assistance in caring for her personal needs and grooming (R. 114). Plaintiff wrote she prepared, on occasion, eggs, bacon and/or sausages for breakfasts; sandwiches or "left overs" for lunches; and "casseroles, pasta, frozen dinners" for dinners, which represented a change in her cooking habits prior to the beginning of her condition. Specifically, Plaintiff asserted her "cooking ha[d] dropped off tremendously" and that her husband "started doing light cooking and getting the lunch or supper." Plaintiff noted she had lost twenty to twenty-five pounds since the onset of her condition. In addition to using the dishwasher and mending clothes, Plaintiff asserted she did laundry, vacuumed, and performed lawn care on a limited basis. Plaintiff noted her husband assisted her with housework as she was "directed not to lift over 10 lbs." Plaintiff said her daily activities had changed since the onset of her condition (R. 115).

Plaintiff wrote she shopped for food one-to-two hours per week and was assisted by her husband. Plaintiff asserted her driving was "very limited." Plaintiff wrote someone took her places "most of the time" because she experienced "panic attacks and [could not] feel [her] feet and fingers," which had caused her to "call for help to come get [her] on many, many occasions." Plaintiff asserted she read newspapers one hour per day, watched television three hours per day, and listened to the radio "most of the day." Plaintiff wrote she partook in the following hobbies and/or interests three to four times per week: sewing, quilting, fishing, sports, playing musical instrument, shopping, limited hunting, and limited gardening. Plaintiff asserted she needed assistance when she

5

gardened and when hunted as she could not lift. Plaintiff wrote she could not sit for extended periods of time because her "extremeties [sic] ache and go knumb [sic]" and she experienced "severe pain in [her] neck and shoulder blade area." Plaintiff asserted she rarely left the house and she did not and/or could not walk anymore (R. 116).

Plaintiff claimed she was visited by her brother monthly, her children weekly, and her friends two or three days per week. Visits from her friends lasted from a "couple hours to 4-5 hours." Plaintiff wrote she left the house three to four days per week to grocery shop and to camp with her husband or a friend, but that she was "not as active socially seeing friends, going places, traveling, shopping" because she did not "feel good" and did not "feel like going out." Plaintiff asserted she could complete a task or chore by taking her time and doing it incrementally. Plaintiff wrote her abilities to concentrate, complete tasks, and follow instructions had changed since the onset of her condition because she experienced pain and had "panic attacks that last as long as four hours" (R. 117).

Also on July 24, 2002, Plaintiff completed a Personal Pain Questionnaire. She noted she experienced "severe pain in neck, shoulder and down arm," "numbness in legs and feet," and "tingling in hands and fingers." Plaintiff described the pain as being "like an ax in [her] shoulder blades." Plaintiff asserted "lifting, sitting, computer work, garden work, housework, riding in a car, and overhead work" exacerbated her pain and "medication, lying down and ice compress, [and] massage" relieved her pain (R. 119). Plaintiff wrote she medicated with Lodine and Ultracet, which caused stomach upset and diarrhea. Plaintiff noted her secondary pain was in the form of panic attacks, chronic anxiety, and headaches. Plaintiff wrote she experienced panic attacks for three to four hours twice per week and her headaches for one to four hours. Plaintiff noted her headaches

6

were moderate during the day and worse at night (R. 120). Plaintiff asserted her secondary pain caused "shaking, stomach ache, head ache [sic], crying" and that sitting and riding in a vehicle worsened her pain (R. 121).

On September 10, 2002, Tracy L. Cosner-Shepherd, M.S., completed an Adult Mental profile of Plaintiff for the West Virginia Disability Determination Service. Plaintiff drove to the evaluation and did not demonstrate any difficulty with ambulation. Plaintiff appeared "to be physically uncomfortable" (R. 155). Plaintiff informed Ms. Cosner-Shepherd she experienced "problems with her neck and back" and panic attacks, which began in the autumn of 2000. Plaintiff asserted her neck pain was "her main problem" because she had a "herniated disc and pinching nerves in her neck." Plaintiff also asserted she experienced lower back pain and could not sit for long periods of time and had difficulty driving. Plaintiff informed Ms. Cosner-Shepherd she experienced panic attacks in the car and in other situations. Plaintiff stated she experienced tingling in her hands, down her legs, and in her feet. Plaintiff stated she felt stressed, had difficulty sleeping, had lost twenty-five pounds, no longer enjoyed cooking, experienced depression, had crying episodes, and had no desire to be around other people (R. 156).

Plaintiff informed Ms. Cosner-Shepherd she had received marriage counseling in 1988 or 1989 and had received no other mental health treatments (R. 156-57). Plaintiff asserted she had undergone five carpal tunnel release surgeries – one on her left hand and four on her right hand. Plaintiff stated she drank socially and a few nights a week (R. 157).

During the evaluation, Ms. Cosner-Shepherd observed Plaintiff to be cooperative and noted she maintained good eye contact and gave adequate responses (R. 158). Ms. Cosner-Shepherd observed the following: Plaintiff's speech was relevant; she was oriented times four; her mood was

slightly anxious; her affect was broad; her thought process was organized; Plaintiff's thought content was a stated phobia of driving or riding in cars and panic attacks while riding in cars; her insight was fair; Plaintiff's judgment was average; she denied suicidal/homicidal ideations; her immediate memory was within normal limits; her recent memory was moderately deficient; her remote memory was average; Plaintiff's concentration was normal; her abstract thinking was normal; and Plaintiff's psychomotor behavior was "somewhat neutral, although she appeared to be anxious." Plaintiff's Verbal IQ was scored at 90; her Performance IQ was scored at 94; and her Full Scale IQ was scored at 91 (R. 159). Plaintiff scored the following on the WRAT3 Test: reading – high school; spelling – post high school; and arithmetic – high school (R. 160).

Ms. Cosner-Shepherd's objective findings were for the following: "physical discomfort, limited movement of neck, anxiety, difficulty with adjustment, poor coping skills, history of substance abuse, depressive features, history of some family dysfunction with abuse in past marital relationship and some memory impairment." Ms. Cosner-Shepherd made the following diagnosis: Axis I – panic disorder with agoraphobia, adjustment disorder with depressed mood, and rule out major depressive episode; Axis II – no diagnosis; Axis III – neck pain, herniated disc, pinched nerve, limited movement in neck, difficulty standing back, difficulty lifting overhead, lower back pain to middle, difficulty sitting for long, difficulty driving, tingling in hands, tingling down legs and feet, difficulty standing for long, difficulty walking for long, and decreased appetite with weight loss (self-report)." Ms. Cosner-Shepherd judged Plaintiff's prognosis to be fair (R. 161).

Plaintiff reported the following activities of daily living to Ms. Cosner-Shepherd: awoke, read paper, drank coffee, showered, "mess[ed] around the house doing what she [could] do with the pain," grocery shopped with her husband, relaxed, watched news, and took a "break" from her

activities each day at noon. Plaintiff reported she cooked three times per week, operated the dishwasher, did laundry twice weekly, occasionally weeded in the yard, shopped for groceries once every two weeks, and sewed a "little." Plaintiff stated she only ran errands with her husband, she did not walk or run, and she no longer skied. Plaintiff reported she attended church occasionally, did not have membership in any clubs or organizations, ate in a restaurant once "every couple weeks," visited with friends "quite often," and visited with her children "a couple times a week." Ms. Cosner-Shepherd found Plaintiff's social functioning to be mildly deficient. Plaintiff's concentration, persistence, pace, and immediate memory were found to be within normal limits (R. 162). Ms. Cosner-Shepherd found Plaintiff's recent memory to be moderately deficient. Plaintiff was found to be able to manage her finances (R. 163).

On September 25, 2002, Kip Beard, M.D., completed an Internal Medicine Examination of Plaintiff for the West Virginia Disability Determination Service (R. 182-86). Plaintiff's chief complaint was for chronic neck and arm pain. Plaintiff stated "she had a remote motor vehicle accident and had whiplash but [did] not recall any significant ongoing problems but [stated] that her neck pain [had] become worse over the last couple of years." Plaintiff stated her neck pain radiated to her shoulder blades and upper arms bilaterally and she experienced tingling in her right arm and some tingling in her left arm (R. 182). Plaintiff asserted she experienced numbness and tingling in her legs if she sat or drove for "very long." Plaintiff denied any back pain (R. 183). Plaintiff informed Dr. Beard she applied heat and ice as treatment for her neck pain (R. 182). Plaintiff also stated she took pain medications and anti-inflammatory drugs to treat her pain (R. 183). Plaintiff asserted her neck pain was exacerbated when she turned her "head too far too rapidly" or used her upper extremities (R. 182).

Plaintiff reported she experienced no difficulties with her cardiovascular, gastrointestinal, genitourinary, and neurological systems (R. 183). Dr. Beard observed Plaintiff was able to stand without assistance and ambulated with a normal appearing gait. She could rise from a seated position and step up and down from the examining table without difficulty. Plaintiff was comfortable while seated, but she stated she was mildly uncomfortable in the supine position due to neck pain. Dr. Beard noted Plaintiff "smell[ed] of alcohol" during the examination (R. 184). Plaintiff's HEENT, neck, chest, cardiovascular, abdomen, extremities, knees, ankles, and feet examinations produced normal results (R. 184-85). Dr. Beard noted Plaintiff complained of pain on cervical spine range of motion testing. He found paravertebral tenderness, but no spasm. Plaintiff's flexion was thirty-five degrees, extension was forty degrees, lateral bending was thirty-five degrees, and bilateral rotation was fifty-five degrees. Plaintiff's arms revealed full shoulder range of motion with complaints of pain. There was no tenderness, redness, warmth, or swelling in the shoulders, elbows, or wrists, and the ranges of motion of the elbows and wrists were normal. Dr. Beard noted Plaintiff's hands revealed "well-healed carpal tunnel release scars bilaterally. No pain, tenderness, redness, warmth or swelling. No Heberden or Bouchard's nodes. No atrophy." Plaintiff was "able to make a fist, able to write and pick up coins without difficulty." Her grip strength was thirty, forty-five, and forty-five pounds of force on the right and fifty, fifty-five, and fifty-five pounds of force on the left. Plaintiff was able to button and pick up coins with either hand. Plaintiff was also able to write with her dominant [right] hand without difficulty. Dr. Beard noted Plaintiff's neurologic examination revealed "some diminished sensation in both hands which [was] mild and seem[ed] compatible with median nerve distribution." He found "Tinel's testing at the wrist produce[d] symptoms radiating up the arm." He found Plaintiff demonstrated no atrophy and no

focal weakness. Except for a one-inch difference in the mid-biceps, Plaintiff's extremity measurements were equal bilaterally. Plaintiff was able to heel walk, toe walk, and heel-to-toe walk. She could squat fully, but experienced a "mild degree of difficulty" rising from the squat position due to neck discomfort (R. 185).

Dr. Beard's impression was for chronic neck pain due to "chronic cervical strain possible superimposed upon some degenerative disc and joint disease without definite evidence of radiculopathy" and "history of bilateral carpal tunnel syndrome status post bilateral carpal tunnel release" (R. 185).

Also on September 25, 2002, an x-ray was made of Plaintiff's lumbar spine. It showed normal alignment, no fracture or dislocation, regular interspaces, no compression or appendicular defect, and normal sacroiliac joints (R. 187).

On September 26, 2002, Joseph Kuzniar, Ed.D., a state agency physician, completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff was not significantly limited in the following abilities: 1) understand and remember detailed instructions, 2) carry out detailed instructions, 3) maintain attention and concentration for extended period, 4) work in coordination with or proximity to others without being distracted by them, 5) accept instructions and respond appropriately to criticism from supervisors, 6) respond appropriately to changes in the work setting, and 7) set realistic goals or make plans independently of others. The state agency physician found Plaintiff demonstrated moderate limitations in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; and ability to travel in unfamiliar places or use public transportation. Plaintiff was found to demonstrate no evidence of limitations in the following abilities: 1) remember locations and work-like procedures; 2) understand and remember very short and simple instructions; 3) carry out very short and simple instructions; 4) sustain an ordinary routine without special supervision; 5) make simple work-related decisions; 6) interact appropriately with the general public; 7) ask simple questions or request assistance; 8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 9) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and 10) be aware of normal hazards and take appropriate precautions (R. 164-65).

Dr. Kuzniar found Plaintiff retained the following functional capacity assessment: "She retains the capacity to at least understand, remember, and carry out somewhat complex instructions. She would have difficulty in driving around the community. She retains the capacity to manage a moderate level w/ social interaction demands and a low to moderate level of stress/pressure" (R. 166).

Also on September 26, 2002, Dr. Kuzniar completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had adjustment disorder and panic attacks with agoraphobia, a "medically determinable impairment . . . that does not precisely satisfy the diagnostic criteria above" for affective disorder and anxiety-related disorder, respectively (R. 171, 173). Dr. Kuznair found Plaintiff's restriction of activities of daily living was moderate as to her driving. He found Plaintiff had mild difficulties in maintaining social functioning and no limitations in maintaining concentration, persistence, or pace. Dr. Kuznair found Plaintiff had no episodes of decompensation (R. 178).

12

On October 3, 2002, Hugh M. Brown, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Brown found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 189). Dr. Brown found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (R. 190-92). Dr. Brown found Plaintiff retained the residual functional capacity for medium work (R. 193).

On December 2, 2002, Plaintiff completed an Activities of Daily Living form wherein she noted she depended on others to cook, do the laundry, keep house, and feed the pets. Plaintiff asserted she had difficulty sleeping at night due to pain and numbness in her neck, arms, lower legs, and feet. Plaintiff stated she retired between 10:00 p.m. to 11:00 p.m. and rose between 7:00 a.m. to 8:00 a.m. and that she napped during the day (R. 136). Plaintiff noted she prepared breakfast; sandwiches or leftovers for lunch; and casseroles, pasta, and frozen leftovers for dinner, which represented a reduction of her past cooking activity as she used to cook every night and her husband now assisted with lunch and dinner preparations. Plaintiff wrote she had lost twenty-five pounds since the onset of her condition. Plaintiff noted she did light laundry, light vacuuming, furniture dusting, some lawn care, loading/unloading dishwasher, and mending clothes. Plaintiff asserted vacuuming caused pain in her neck, back, and arms and that her husband assisted with the laundry and vacuuming (R. 137). Plaintiff noted she shopped for food for one to two hours per week and was assisted by her husband, who lifted for her. Plaintiff asserted her driving was limited and she relied on her husband or a friend to drive her. Plaintiff's activities were reading the newspaper for one hour per day, watching television for three hours per day, and listening to the radio for most of

13

the day. Plaintiff's hobbies included sewing, quilting, fishing, television sports, some gardening, occasionally playing musical instrument, and shopping. Plaintiff asserted she no longer hunted or walked. Plaintiff noted she spent three to four hours engaged in her hobbies per week. Plaintiff noted she could not sit for extended periods of time because her "extremities ache and go knumb [sic]" and she experienced pain in her neck and shoulders. Plaintiff wrote she did "barely ½ what [she] used to do" (R. 138).

Plaintiff noted she received visits weekly from her children, monthly from her brother, and multiple weekly visits from friends which lasted two to three hours or longer. Plaintiff asserted she left her home three to four times weekly to market and "a couple times a week" to visit her camp. Plaintiff claimed she was not as "active socially" as she used to be because of neck and back pain. Plaintiff noted she did "not normally" have difficulty concentrating and she finished tasks or chores by doing them "incrementally." Plaintiff also claimed her ability to concentrate and complete tasks had changed due to her symptoms because pain made her "cry" and "have panic attacks that last[ed] as long as four hours" (R. 139).

On December 26, 2002, James Capage, Ph.D., reviewed the September 26, 2002, Mental Residual Functional Capacity Assessment and Psychiatric Review Technique completed by Dr. Kuznair and affirmed same (R. 165, 168).

On January 2, 2003, Thomas Lauderman, D.O., completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 197). Dr. Lauderman found Plaintiff had no postural, manipulative, visual,

14

communicative, or environmental limitations (R. 198-200).

On February 7, 2003, Dr. Espina completed a mental impairment questionnaire of Plaintiff. Dr. Espina opined Plaintiff was positive for the following signs and symptoms: appetite disturbance, social withdrawal or isolation, mood disturbance, emotional lability, anhedonia or pervasive loss of interest, sleep disturbance, social withdrawal or isolation, decreased energy, persistent irrational fears, generalized persistent anxiety, and hostility and irritability (R. 204). Dr. Espina did not list any clinical findings to support her opinions. Dr. Espina did not note whether Plaintiff was malingerer. Dr. Espina opined Plaintiff's impairments were reasonably consistent with her symptoms and functional limitations. Dr. Espina noted Plaintiff was being medicated for panic/anxiety attacks, sleep disturbances, and pain. Dr. Espina noted Plaintiff experienced dizziness, drowsiness, nervousness, and stomach upset due to the medications. Dr. Espina did not note a prognosis for Plaintiff and did not note if Plaintiff's psychiatric condition exacerbated her pain. According to Dr. Espina, Plaintiff's impairments lasted or were expected to last for twelve months. Dr. Espina found Plaintiff's IQ was not low and she did not experience reduced intellectual functioning (R. 205).

Dr. Espina opined Plaintiff would be absent from work more than three times per month. Dr. Espina found Plaintiff's mental abilities to do unskilled work were as follows: 1) Plaintiff's abilities to carry out very short and simple instructions and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes were unlimited or very good; 2) Plaintiff's abilities to remember work-like procedures, understand and remember very short and simple instructions, sustain an ordinary routine without special supervision, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and

be aware of normal hazards and take appropriate precautions were good; 3) Plaintiff's abilities to maintain attention for two hours segments, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, respond appropriately to changes in a routine work setting, and deal with normal work stress were fair; and 4) Plaintiff's abilities to maintain regular attendance and be punctual within customary, usually strict, tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods were poor or none (R. 206-07).

Dr. Espina found Plaintiff demonstrated the following mental abilities and aptitudes to do semiskilled and skilled work: 1) a good ability to understand and remember detailed instructions, to carry out detailed instructions, and to set realistic goals or make plans independently of others; and 2) a fair ability to deal with stress of semiskilled and skilled work. Dr. Espina found Plaintiff demonstrated the following mental abilities and aptitudes to do particular types of jobs: 1) a good ability to interact appropriately with the general public 2) a fair ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and 3) a poor or no ability to travel in unfamiliar places or use public transportation (R. 207).

Dr. Espina opined Plaintiff possessed the following degrees of functional limitations: 1) extreme functional limitation in her restriction of activities of daily living; 2) marked functional limitation in difficulty in maintaining social functioning; 3) constant functional limitations in deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and 4) repeated episodes of deterioration or decompensation in work or work-like settings which would cause Plaintiff to withdraw from that situation or to experience exacerbation of signs

and symptoms. Dr. Espina also opined Plaintiff's other limitations were her ability to sit, stand, and walk for very short time and her ability to lift less than ten pounds as these activities caused "severe neck & back pain . . . fingers, lower arms, legs & feet go numb." Dr. Espina noted Plaintiff could not "sit at a work station/computer without having severe pain in neck/shoulders and numbness in hand & legs/feet." Dr. Espina felt Plaintiff could manage benefits (R. 208).

On February 19, 2003, Plaintiff underwent a cervical spine MRI. The result was for "stable appearance of herniations of nucleus pulposus with mild narrowing of the spinal canal, with compression of the left neural foramina at C4-C5, C5-C6, and C6-C7, with extension to the right at the C5-C6 level." There were "no major change since the previous study of December 14, 2000" (R. 242).

On February 20, 2003, Plaintiff was examined by Dr. Ireland and was diagnosed with cervical spondylosis without myelopathy, which was noted as a "working diagnosis" (R. 229). She received an epidural steroid cervical injection at Winchester Neurological Consustants, Inc. (R. 221-22).

Also on February 20, 2003, a state agency physician reviewed the January 2, 2003, Physical Residual Functional Capacity Assessment of Plaintiff by Dr. Lauderman and agreed with his findings (R. 214-15).

On February 24, 2003, a state agency physician reviewed the December 26, 2002, findings of Dr. Capage, which were based on the September 26, 2002, findings of Dr. Kuznair, and agreed with those findings (R. 217-20).

On March 3, 2003, Plaintiff returned to Dr. Ireland and informed him she was "still struggling with pain." Plaintiff informed Dr. Ireland she was no longer medicating with

Hydrocodone or Elavil, but was taking Ultracet. Plaintiff reported pain in her neck and tingling and numbness in her thumb and second and third digits of her left hand. Plaintiff stated that the pain was not radiating into her left arm. Plaintiff informed Dr. Ireland she experienced pain down her right "arm into her forearm with some numbness and tingling in her distal forearm but not really into her fingers and hand as much." Plaintiff reported to Dr. Ireland she had shoveled snow "the other day." Dr. Ireland's examination revealed Plaintiff had good strength (R. 230).

Dr. Ireland noted the "repeat MRI scan shows a slight disc bulge at C4-5 but that doesn't cause any significant neural impingement. At C5-6 she has a central to left lateral disc bulge causing some left C5-6 neuroforaminal stenosis. At the C6-7 level she has a left lateral disc bulge causing left C7 nerve root impingement. There is mild spinal stenosis at best and I do not see any signal change within the cord." Dr. Ireland further opined the following: "At this juncture, we discussed a little bit regarding epidural steroid injection and I would like her to try that and try to sort out some of these symptoms. There may be some neuroforaminal stenosis at C5-6 on the right but I am hard pressed to explain the right sided symptoms in her arm based on her MRI scan. She still has a lot of issues regarding returning to work. The last time she had an epidural steroid injection she felt good but she went back to work one day and was suffering from pain. She has applied for disability. She, again, asked what her limitations are and I don't know those at this point without an FCE." Dr. Ireland ordered an epidural steroid injection and "encouraged" Plaintiff to take 600mg of Ibuprofen along with the Ultracet. Dr. Ireland informed Plaintiff he would examine her after the injection and after "we get these more acute type symptoms settled down and get her a little bit more functional with her activities of daily living than [sic] we can look at a FCE to determine her limitations and any future ability to have her gainfully employed" (R. 230).

18

On March 20, 2003, Dr. Espina noted Plaintiff had been treated by Dr. Ireland for a bulging disc and "possible slight herniation of the disc." Dr. Espina noted Plaintiff experienced "some problem with the right arm with some numbness and weakness," with decreased reflexes of the right arm and a weaker right grip as compared to the left. Dr. Espina opined Plaintiff's panic attacks "seem[ed] better on the Alprazolam." Dr. Espina noted Plaintiff "stopped the Amitriptyline at bedtime" but still took Ultracet for pain. Dr. Espina observed Plaintiff's neck range of motion "seem[ed] better."

On May 13, 2003, Plaintiff returned to Dr. Ireland and reported she was "doing pretty well." She informed Dr. Ireland the epidural steroid injection had "helped her and she has been kind of maintaining." Plaintiff reported she "knew what her limits" were and what "activities . . . bother[ed] her." She stated "riding . . . bother[ed] her" as she experienced "some pain along her neck and right shoulder . . . and then she [would] feel numb down her right arm and even down her right leg"; however, "there [were] other days when she has no pain and [felt] good." Dr. Ireland informed Plaintiff he would see her again on an "as needed basis." His plan of treatment included resorting to epidural steroid injections when Plaintiff experienced "real severe" pain (R. 232).

On August 1, 2003, Plaintiff testified at the administrative hearing that her activities of daily living were staying home, doing "a little at a time to keep up with the house," doing "a little bit of sewing," watching the mid-day news, and sitting in an easy chair (R. 254-55). Plaintiff stated she no longer rode as a passenger on a motorcycle, had not done a "river float" in two years, could not sit for "very long," and no longer rode a bicycle (R. 255). Plaintiff testified she dined out with friends once per week (R. 263). Plaintiff stated she was "not allowed to do any over head work . . . because . . . [it caused] the bulge and herniated disc to inflame" and she was "not suppose to lift anything over ten pounds" (R. 255-56). Plaintiff stated she had hunted the previous year (R. 256).

Plaintiff testified the medication prescribed by Dr. Espina for anxiety attacks took "the edge off" but that she still experienced "fear upon driving." Plaintiff stated that while sitting in the car for "seven hours," her legs and hands went numb and she became nervous because she felt she did not have control of the automobile (R. 259). Plaintiff stated the anxiety attacks occurred on a regular basis before she started taking Xanx, but were now "unpredictable" as a result of her taking Xanax (R. 263). Plaintiff stated she could drive five miles or up to one hour without symptoms (R. 259).

Plaintiff testified she was able to walk for one-half mile (R. 259). Plaintiff stated she could lift and carry "between ten and fifteen pounds at the maximum" (R. 261).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Arthur made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision and potentially through December 31, 2005 (Exhibit 6D).

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's cervical sprain/strain is determined to be a severe impairment, based upon the requirements in the Regulations (20CFR § 404.1521).

4.  This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 either individually or in combination as discussed in the narrative of the decision.

5.  The undersigned finds the claimant's allegations regarding his [sic] limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR § 404.1527).

20

7.     The claimant, granting her some benefit of doubt considering the limited medical evidence of record in some areas, has the residual functional capacity for light [lifting no more than 20 pounds occasionally and 10 pounds frequently] and alternatively sedentary [lifting 10 pounds or less] work. The claimant's ability to perform the full range of the light and sedentary exertional levels is diminished by the following: no climbing ladders, ropes or scaffolds; no work that involves hazardous heights or hazardous moving machinery or extreme temperature changes; no work that requires above the shoulder upper extremity reaching and carrying; and she requires low stress routine work [i.e. work that requires no more than moderate attention and concentration and persistence and pace for prolonged periods]. She can occasionally climb stairs and ramps, and balance and stoop and kneel and crouch but no work involving crawling. She needs to avoid excessive vibration. She experiences moderate pain ["moderate" is defined to preclude the attention and concentration required for high stress production oriented and complex work, but which is not at a level of severity to preclude the attention and concentration required for less stressful work of an unskilled nature involving performance of simpler work instructions {with "simpler" being used as customarily used in normal work rules and not referring to sheltered work type work}] and moderate [as defined] limitations as to performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances and as to completing a normal workday or work week without interruptions from psychological symptoms and to perform at a consistent pace without an unreasonable length and number of rests periods; with no work requiring direct regular immediate contact with the general public but not precluding all contact with the general public.

8.     The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

9.     The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

10.     The claimant has "more than a high school (or high school equivalent) education" (20 CFR § 404.1564).

11.     The claimant has no transferable skills from work previously performed as described in the body of the decision (20 CFR § 404.1568).

12.     The claimant has the residual functional capacity to perform a significant range of light and sedentary work (20 CFR § 404.1567).

13.     Although the claimant's exertional limitations do not allow him [sic] to perform the full range of light work, using Medical-Vocational Rule 202.22 and 201.22 as a

framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include light work as a machine tender, packer, grader/sorter, and sedentary work as a finish machine operator, quality control and general clerical, as more fully discussed in the narrative of the decision with the vocational expert finding the work consistent with the Dictionary of Occupational Titles. There is no medically documented 12-month continuous period during which the claimant was precluded from performing the work identified by the impartial expert.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)) (R. 34-35).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual

finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ failed to properly identify Plaintiff's impairments.

2. The ALJ erred as to Plaintiff's credibility.

The Commissioner contends:

1. The ALJ properly identified Plaintiff's impairments and the ALJ's RFC assessment is supported by substantial evidence.

2. The ALJ properly assessed Plaintiff's credibility.

## C. Impairments

Plaintiff contends the ALJ failed to properly identify Plaintiff's impairments. Defendant contends the ALJ properly identified Plaintiff's impairments and the ALJ's RFC assessment is supported by substantial evidence. Plaintiff asserts the ALJ did not consider all her medically determinable impairments and failed to fully address Plaintiff's severe impairments in the body of his decision.

In his decision, the ALJ opined the following: "The medical evidence indicates that the claimant has cervical strain and panic attacks, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4" (R. 28). The ALJ addressed the severe impairment of panic attacks as follows:

> Regarding the claimant's allegation of panic attacks, Tracy Cosner-Shepherd conducted a consultative evaluation on September 17, 2002. The claimant reported

23

panic attacks, especially while driving. Objective findings included limited neck movement, difficulty with adjusting, poor coping skills and depressive features. Ms. Cosner-Shepherd diagnosed panic disorder with agoraphobia and adjustment disorder with depressed mood. . . . (R. 29).

The ALJ did not discredit Ms. Cosner-Shepherd's diagnosis in his analysis and opinion of Plaintiff's

mental impairment.

The ALJ, based on his finding Plaintiff's panic attacks were a severe impairment and on his

review and acceptance of the medical evidence of record relative to Plaintiff's panic attacks, had an

obligation to follow the special technique in evaluating a mental impairment as mandated by 20

C.F.R. §404.1520a, which reads as follows:

> The steps outlined in §404.1520 apply to the evaluation of physical and mental impairments. In addition, when we evaluate the severity of mental impairments for adults (persons age 18 and over) and in persons under age 18 when Part A of the Listing of Impairments is used, we must follow a special technique at each level in the administrative review process. We describe this special technique in paragraphs (b) through (e) of this section. . . .

> (b) *Use of the technique.* (1) Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). See §404.1508 for more information about what is needed to show a medically determinable impairment. If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.

> (2) We must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section.

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

(d) *Use of the technique to evaluate mental impairments.* After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

(1) If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see §404.1521).

(2) If your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. We will record the presence or absence of the criteria and the rating of the degree of functional limitation on a standard document at the initial and reconsideration levels of the administrative review process, or in the decision at the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision). See paragraph (e) of this section.

(3) If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.

(e) *Documenting application of the technique.* At the initial and reconsideration levels of the administrative review process, we will complete a standard document

to record how we applied the technique. At the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision), we will document application of the technique in the decision.

(1) At the initial and reconsideration levels, except in cases in which a disability hearing officer makes the reconsideration determination, our medical or psychological consultant has overall responsibility for assessing medical severity. The disability examiner, a member of the adjudicative team (see §404.1615), may assist in preparing the standard document. However, our medical or psychological consultant must review and sign the document to attest that it is complete and that he or she is responsible for its content, including the findings of fact and any discussion of supporting evidence. When a disability hearing officer makes a reconsideration determination, the determination must document application of the technique, incorporating the disability hearing officer's pertinent findings and conclusions based on this technique.

(2) At the administrative law judge hearing and Appeals Council levels, the written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

(3) If the administrative law judge requires the services of a medical expert to assist in applying the technique but such services are unavailable, the administrative law judge may return the case to the State agency or the appropriate Federal component, using the rules in §404.941, for completion of the standard document. If, after reviewing the case file and completing the standard document, the State agency or Federal component concludes that a determination favorable to you is warranted, it will process the case using the rules found in §404.941(d) or (e). If, after reviewing the case file and completing the standard document, the State agency or Federal component concludes that a determination favorable to you is not warranted, it will send the completed standard document and the case to the administrative law judge for further proceedings and a decision.

The ALJ in this case failed to comply with §404.1520(e)(2) in that he did not utilize the

standard evaluation technique as outlined in the above quoted section. Specifically, the ALJ did not

"specify the symptoms, signs, and laboratory findings that substantiate the presence of" Plaintiff's

panic attacks "and document [his] findings" by incorporating "the pertinent findings and conclusions

based on the technique" in his decision. The ALJ's decision did not "include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section" relative to Plaintiff's panic attacks. Those functional areas are activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Except for his discussion of the findings of Ms. Cosner-Shepherd and his not affording significant weight to Dr. Espina's opinion relative to Plaintiff's mental impairment, the ALJ did not analyze the evidence of record relative to Plaintiff's panic attacks, failed to consider and evaluate the functional limitations of Plaintiff's mental disorder on her ability to do work, and failed to include specific findings as to the degree of limitation in each of the four functional areas in the text of his decision.(R. 29-30).

Plaintiff also contends that the ALJ failed to incorporate all of Plaintiff's medically determinable impairments, specifically depression symptoms, carpal tunnel syndrome, diminished sensations in her hands and diminished grip strength, and her right arm numbness and tingling, in his assessment of Plaintiff's limitations (Plaintiff's brief at p. 11). The ALJ found the "medical evidence of record establishes that the claimant has complaints of chronic neck and arm pain" (R. 29). The ALJ also found Plaintiff had "a musculoskeletal impairment manifested by pain and limitation of motion in the upper extremities" (R. 31). The evidence of record contains a diagnosis of depressed mood by Ms. Cosner-Shepherd, but the record does not contain a diagnosis of depression. On July 31, 2001, Dr. Espina noted Plaintiff may have experienced "possible depression," but he did not diagnose Plaintiff with that condition (R. 212). Additionally, the record contains no evidence Plaintiff was ever treated for depression. The record also contains no evidence of treatment for carpal tunnel syndrome after Plaintiff had undergone four carpal tunnel releases on the right wrist and one on the left at some time prior to January 1999 (R. 213). The ALJ's finding

27

that Plaintiff had the medically determinable impairments of chronic neck and arm pain and a musculoskeletal impairment and his RFC of Plaintiff as a result of those findings adequately addresses her right hand and arms limitations.

Based on the above analysis, the undersigned finds the ALJ did not err in failing to incorporate Plaintiff's medically determinable impairments of depression and carpal tunnel syndrome and adequately incorporated Plaintiff's right hand and arm limitations in his decision and that his decision relative to those issues is supported by substantial evidence. The undersigned finds, however, the ALJ erred in not properly evaluating the Plaintiff's mental impairment in conformance with §404.1520(e)(2).

### D. Credibility

The Plaintiff contends the ALJ erred as to Plaintiff's credibility. Defendant contends the ALJ properly assessed Plaintiff's credibility. Plaintiff asserts the ALJ's primary reason for finding Plaintiff was not totally credibly "revolved around Plaintiff's daily activities" (Plaintiff's brief at p.13).

The Fourth Circuit has mandated a two-step process to determine whether a person is disabled by pain or other symptoms. First the ALJ must expressly consider whether the claimant demonstrated, by objective medical evidence, an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. *Craig v. Chater,* 76 F.3d 585.

In determining Plaintiff's credibility, the ALJ found the "medical evidence demonstrates that the claimant has an impairment that can reasonably be expected to produce some pain and limitation

. . ." (R. 31). Said finding satisfies the first step as mandated in *Craig*. The ALJ then considered

the extent to which Plaintiff's symptoms of pain were consistent with the objective medical evidence

as required in step two of *Craig*. The ALJ noted that Dr. Beard diagnosed chronic neck pain in

September 2002 and Ms. Cosner-Shepherd's opined in September 2002 that Plaintiff was

"'mildly'" limited in activities of daily living and social functioning and her concentration,

persistence and pace were within normal limits. The ALJ considered the opinion of Plaintiff's

treating physician that her neck pain did not radiate down her arm and she was able to shovel snow.

The ALJ considered the medical signs and laboratory findings; specifically the ALJ noted the

February 2003 MRI of Plaintiff's cervical spine showed only mild narrowing of the spinal canal (R.

29).

Based on his review of the record, the ALJ found the following: "[t]he medical evidence

demonstrates that the claimant has an impairment that can reasonable by expected to produce some

pain and limitation but not to the extend alleged by the claimant. The claimant alleges pain and

limitation but her treating physicians have indicated that she is progressing well. No surgery had

been recommended. She takes some prescription medications but, by her own testimony, avoids

these and instead uses over the counter medications. Despite the claimant's complaints, there is no

objective basis to support the extent of her complaints" (R. 31).

The ALJ also considered Plaintiff's statements relative to her pain and limitations. He noted

Plaintiff testified that she could "no longer ride a motorcycle or do any overhead lifting and that she

does little around the house, except for watching a little TV and doing a little sewing. She cannot

lift more than 10 to 15 pounds and cannot sit for more than 1 hour before her legs and hands go

numb. Her husband helps with the groceries and she is able to drive short distances." The ALJ then

weighed and compared that testimony to the evidence of record as follows:

> By exhibits [e.g. 4E dated July 24, 2002, 3F dated September 17, 2002 and 8E dated December 2, 2002] and testimony at the hearing, the claimant indicated that, during the period under review, she was able to engage in the following activities: household work, visit with family and friends, shop, read for about an hour a day [like the newspaper], watch TV for 3 hours a day, listen to the radio, engage in hobbies 3 or 4 times a week, do gardening but needs some help, and go hunting [she indicated in the December 2000 activity statement that she had stopped hunting but at hearing admitted she did do some hunting in 2002 but has done no hunting in 2003 but it is noted the hunting season had not begun during the period when the hearing was held], does the laundry [but her husband carries the heavy laundry to the washing machine for her]; she denied doing any vacuuming in July 24, 2002 statement but she indicated she was doing it in July [sic] 24, 2002 and December 2, 2002 statements; mending clothes, dusting; cooking 3 times a week, doing the laundry twice a week, pulling weeds in the garden, going grocery shopping, doing some sewing, and occassionally going to Church (R. 30).

Based on this comparison, the ALJ opined the following: "The ability to engage in the afore-mentioned activities, while only one of the factors considered, acts to undercut the claimant's argument that from her date of onset she was precluded from engaging in any work activities" (R. 30).

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (citing *Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)).

The undersigned, therefore, assigns great weight to the opinion of the ALJ and finds the ALJ properly considered and evaluated the objective medical evidence, the medical signs and laboratory findings, and the Plaintiff's testimony and statements found in the evidence of record in making his determination that Plaintiff was "not fully credible" and that his decision is supported by substantial evidence.

30

## V. RECOMMENDED DECISION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's application for DIB. I, accordingly, recommend Defendant's Motion for Summary Judgment be **DENIED**, and Plaintiff's Motion for Summary Judgment be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___ day of June, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

31